**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| HELEN J. BROWN, | ) | NO. ED CV 17-1901-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| NANCY A. BERRYHILL, Deputy | ) | **AND ORDER OF REMAND** |
| Commissioner for Operations, | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied, and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

Plaintiff filed a complaint on September 18, 2017, seeking review of the Commissioner's denial of benefits. The parties consented to proceed before a United States Magistrate Judge on November 24, 2017. Plaintiff filed a motion for summary judgment on February 15, 2018.

Defendant filed a motion for summary judgment on March 15, 2018.  The

Court has taken the motions under submission without oral argument.

See L.R. 7-15; "Order," filed September 21, 2017.

**BACKGROUND**

Plaintiff asserts disability since January 13, 2013, based on,

inter alia, cervical spine correction, fibromyalgia, neuropathy,

spinal fusion, degenerative disk disease, arthritis, bursitis,

fatigue, chronic pain, sciatica, and irritable bowel syndrome

(Administrative Record ("A.R.") 120, 131, 134-35).  In May of 2014,

treating physician Dr. Frederick Davis stated that Plaintiff had

continued pain "not relieved with current treatment" and opined that

Plaintiff could not be gainfully employed while she was being treated

with the type of pain medication she then was taking (A.R. 1502).

An Administrative Law Judge ("ALJ") reviewed the record and heard

testimony from Plaintiff and a vocational expert (A.R. 9-17, 22-42).

The ALJ found that Plaintiff has "severe" obesity, congenital

kyphosis, status post thoracic and upper lumbar fusion, status post

laminectomies, lumbar facet arthropathy, thoracic spine degenerative

changes, left carpal tunnel syndrome, and fibromyalgia, but retains

the residual functional capacity for a limited range of light work.

See A.R. 11-12, 16 (giving "significant weight" to state agency

physicians' physical residual functional capacity assessments at A.R.

47-48 and 57-58).  The ALJ found Plaintiff was capable of performing

her past relevant work as a public transit dispatcher, and, on that

///

basis, denied disability benefits (A.R. 17 (adopting vocational expert testimony at A.R. 37-38)).[1]

In determining Plaintiff's residual functional capacity, the ALJ rejected Plaintiff's subjective complaints as "less than fully consistent with the evidence" (A.R. 13, 16). Plaintiff had testified that her impairments cause her to suffer pain and limitations of allegedly disabling severity.[2] Plaintiff also testified that she could not take her pain medications (which included Morphine and Percocet) and perform the jobs the vocational expert had described. See A.R. 41; see also A.R. 190-91 (Plaintiff's letter to the Appeals Council stating that she could not work while taking Morphine, Oxycodone, and Cyclobenzaprine (Flexeril), and that if she did not take those medications she would not be able to sit and stand).

The Appeals Council denied review (A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's

---

[1] The vocational expert also identified other work that a person with Plaintiff's asserted residual functional capacity could perform. See A.R. 39-40.

[2] Plaintiff testified that she could not work because pain from fibromyalgia and her fused back is so severe that she cannot sit or stand for very long (A.R. 30). Plaintiff thought she could sit for up to 30 minutes at a time and stand for up to 20 minutes at a time (A.R. 30-31). Plaintiff thought she could lift five pounds and said she had difficulty carrying groceries (A.R. 33).

findings are supported by substantial evidence; and (2) the
Administration used correct legal standards.  See Carmickle v.
Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue,
499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner,
682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such
relevant evidence as a reasonable mind might accept as adequate to
support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401
(1971) (citation and quotations omitted); see also Widmark v.
Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ.  But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
quotations omitted).

**DISCUSSION**

Plaintiff contends that the ALJ erred in failing to consider
specifically Plaintiff's testimony concerning the alleged side effects
from Plaintiff's medications.  Plaintiff also contends that the ALJ's
general rationale for rejecting Plaintiff's testimony does not apply
in her case.  See Plaintiff's Motion, pp. 4-10.

Defendant defends the ALJ's stated reasons for rejecting Plaintiff's testimony, and argues that Plaintiff never specifically identified any of the side effects she experienced or reported any side effects to her doctors or to the Administration. <u>See</u> Defendant's Motion, pp. 2-10; <u>see also, e.g.</u>, A.R. 155, 163 ("Disability Report - Appeal" forms wherein Plaintiff listed her medications but noted no side effects).

I. **Summary of the Medical Record**

In August of 2012, Plaintiff presented for a rheumatology consultation for allegedly ongoing issues with back and hand pain (A.R. 204). Plaintiff had been diagnosed with, <u>inter alia</u>, chronic low back pain, joint pain, fibromyalgia, and neuropathy (A.R. 194, 204-05). Plaintiff was taking Flexeril, two to three Norco a day, and Nortriptyline at night for pain (A.R. 194-95, 204-06, 226, 640). Plaintiff had been given epidural corticosteroid injections to relieve sciatica pain (A.R. 205). On examination, Plaintiff reportedly had tenderness but good range of motion in her shoulders, elbows, wrists, hips, knees, and ankles, 14/18 positive fibromyalgia tender points, and likely osteoarthritis (A.R. 206-08).[3] She was assessed with

///

---

[3] X-rays of Plaintiff's hands and hips were unremarkable (A.R. 210, 213-14). X-rays of Plaintiff's cervical spine showed mild disk space narrowing and spurring at C3-C4, C5-C6, and C6-C7, indicating degenerative disk disease and cervicalgia/cervical radiculopathy (A.R. 211, 352-53). Thoracic and lumbar spine x-rays showed degenerative disk disease at L5-S1 (A.R. 212-13). Knee x-rays showed mild narrowing of the medial compartments of both knees and deformity of the mid right fibula (A.R. 214).

chronic back pain, congenital kyphosis, fibromyalgia, and joint pain (A.R. 208, 224-25).

In November of 2012, Plaintiff returned to her primary care physician complaining of moderately severe low back pain for two to three days in one location radiating to the buttock (A.R. 268). Her doctor gave her a shot of Toradol and prescribed Relafen and a course of Prednisone (A.R. 269-71). Plaintiff declined a physical therapy referral (A.R. 269). Plaintiff returned in December of 2012 complaining of continued pain in the same location (A.R. 276-78). On examination, Plaintiff reportedly had decreased range of motion, tenderness, pain, spasm, and an abnormal straight leg raise test (A.R. 277-78). She was assessed with low back pain and sciatica and given a Dilaudid injection (A.R. 278). When Plaintiff returned with continued complaints of low back pain in January of 2013, she was referred for physical therapy (A.R. 287-89).

Dr. Davis began treating Plaintiff for her pain in January of 2013 (A.R. 314-19). Plaintiff initially complained of midline lumbo-sacral pain, numbness and tingling in her feet and bursitis, and reported that she had undergone surgery for excessive kyphosis and had hardware removal in 2000 (A.R. 315). On examination, Plaintiff reportedly had limited range of motion in the lumbar spine causing spasm, an abnormal antalgic gait, and tenderness to palpation (A.R. 316-17). Dr. Davis reviewed imaging of Plaintiff's lumbar and thoracic spine showing thoracic spine fusion and severe degenerative disk disease at L5/S1 (A.R. 317). Dr. Davis diagnosed Scheurmanns kyphosis and surgical correction with hardware removal, neuropathy,

and bursitis (A.R. 317). Dr. Davis referred Plaintiff for acupuncture and physical therapy, and increased Plaintiff's Nortriptyline dose (A.R. 317).

Plaintiff thereafter attended physical therapy. <u>See, e.g.</u>, A.R. 322-41 (physical therapy records). Plaintiff returned to Dr. Davis in April of 2013, reporting that she did not have much benefit from physical therapy but did have some improvement with acupuncture (A.R. 345). She also stated that Norco and Flexeril were not helping with her pain (A.R. 345). Her range of motion reportedly was "within functional limits" (A.R. 345). Dr. Davis assessed symptoms consistent with bilateral carpal tunnel syndrome ("CTS (B)"), ordered nerve conduction studies ("NCS") and more acupuncture, as well as wrist splints to be worn at night (A.R. 345-46).[4]

Later in April of 2013, Plaintiff presented to another doctor for complaints of right hip, left shoulder, and left elbow pain following a car accident (A.R. 365-69, 373-78). She was assessed with an elbow sprain, hip pain, shoulder strain, and chronic back pain (A.R. 366).[5] In May of 2013, Plaintiff reported low back pain with tingling in her hands, pain shooting down her right leg, and some right side tingling (A.R. 384). On examination, she reportedly had tenderness but normal

---

[4]    Nerve conduction studies from April of 2013 were abnormal, showing evidence of bilateral carpal tunnel syndrome, left greater than right (A.R. 359-60).

[5]    X-rays of her left shoulder and left elbow were unremarkable (A.R. 367-68). X-rays of her cervical, thoracic, and lumber spine showed no fracture but moderate degenerative joint disease (A.R. 376-78, 387).

range of motion (A.R. 385). She was assessed with a neck strain and low back pain and referred for physical therapy (A.R. 385-86).

In July of 2013, Plaintiff returned to Dr. Davis reporting new pain from her accident and saying that Norco and using a TENS unit were not helping (A.R. 401). On examination, she reportedly had a guarded range of motion, antalgic gait, and 1/2 reflexes in the lower extremities (A.R. 401). Dr. Davis continued Plaintiff's acupuncture and ordered an MRI (A.R. 401).[6] Dr. Davis also told Plaintiff to stop taking Norco and to try Percocet (oxycodone) for pain control (A.R. 1167-68).

Dr. Davis also referred Plaintiff to Dr. Michael Kim, who evaluated Plaintiff in July of 2013 for pain injections for her lower back (A.R. 424-28, 1162). On examination, Plaintiff reportedly had neck pain, myalgias, back pain, joint pain, tingling and sensory change, diffuse tenderness to palpation, limited range of motion, and positive Patrick's tests (A.R. 425-27). Dr. Kim assessed lumbar facet arthropathy and sacroiliac joint pain and ordered a sacroiliac joint injection (A.R. 428; see also A.R. 436 (record of injection)). In September of 2013, Plaintiff received a second sacroiliac joint injection (A.R. 1249-50). In November of 2013, Plaintiff received a third sacroiliac joint injection (A.R. 454-55).

---

[6]     A lumbar spine MRI from July of 2013 showed fusion at L1-L2, multilevel mild degenerative changes from L3-L4 through L5-S1, mild central canal stenosis at L4-L5, and mild bilateral neuroforaminal narrowing at L4-L5 and L5-S1 (A.R. 402-03).

In January of 2014, Plaintiff returned to Dr. Davis complaining of pain even on Percocet, after having altered her lifestyle to "not press herself" (A.R. 466-67). Dr. Davis noted that Plaintiff's fibromyalgia "contributes to her pain issues and her ability to cope with this" (A.R. 466). On examination, Plaintiff reportedly had limited range of motion (A.R. 467). Dr. Davis recommended aquatic therapy, more injections when she is eligible, and continued pain medication (A.R. 467).

In April of 2014, Plaintiff returned to Dr. Davis reporting continued back pain not relieved by her current treatment (A.R. 515-16). Dr. Davis described Plaintiff's fibromyalgia as "a significant component" (A.R. 516). On examination, Plaintiff reportedly had an antalgic gait (A.R. 516). Dr. Davis ordered x-rays and a CT scan and prescribed Gabapentin (A.R. 516).[7] Dr. Davis stated, "The patient is totally disabled and will not be able to be engaged in any employment" (A.R. 516). By the time of this visit, Plaintiff had been notified

///

---

[7]      X-rays of Plaintiff's lumbar spine showed no change in generalized osteopenia from a May, 2013 study, and mild retrolisthesis of L3 on L4 with mild disk space narrowing, mild degenerative vacuum disk, and small marginal osteophytes (A.R. 519). A CT scan of Plaintiff's lumbar spine showed no significant abnormality (A.R. 517-18). A CT scan of Plaintiff's thoracic spine showed mild kyphosis of the lower thoracic spine, fusion at T7 through T1, mild degenerative central canal stenosis at T9-T10, hypertrophic degenerative changes of the left T10-T11 facet joint with moderate compression of the thecal sac posterior laterally on the left side, moderate compression of the thecal sac and the cord, obliteration of the left T10-T11 subarticular space, moderate narrowing of the left T10-T11 neural foramen, and hypertrophic degenerative changes at the T11-T12 facet joint with compression of the thecal sac and mild central canal stenosis (A.R. 520-21).

that her disability claim had been denied on initial evaluation (A.R. 62-65).[8]

In May of 2014, Plaintiff returned to Dr. Davis to review her test results (A.R. 1501-02). Dr. Davis opined that Plaintiff has "definite fibromyalgia" (A.R. 1502). Her gait again reportedly was antalgic (A.R. 1502). Dr. Davis stated he would try to get Plaintiff's fibromyalgia under control with increasing doses of Gabapentin to help with her overall pain (A.R. 1502). Dr. Davis also stated: "[Plaintiff] again cannot be gainfully employed [while] being treated with this type of medication. The patient is totally disabled and will not be able to be engaged in any employment" (A.R. 1502).

Plaintiff returned to Dr. Davis in June of 2014 reporting symptomatic carpal tunnel syndrome (i.e., she was dropping things), and sleepiness with her dose of Gabapentin (A.R. 1509). Her gait reportedly was not antalgic on this visit (A.R. 1509). Dr. Davis indicated that Plaintiff's x-rays from April of 2013 had shown degenerative disk disease at C3-C4 and C5-C6 (A.R. 1509). Dr. Davis ordered new nerve conduction studies and indicated that, depending on findings from those studies, there might be a need to look at

---

[8]    The state agency physicians reviewed medical records through January, 2014 initially, and through April, 2014 on reconsideration (A.R. 44-46, 54-56). On initial review, the state agency physician acknowledged that Plaintiff had fibromyalgia and other conditions, but opined that Plaintiff's conditions were "satisfactorily controlled with the treatments," and described Plaintiff's subjective complaints as "disproportionate to objective findings" (A.R. 46-47; see also A.R. 56-57 (state agency physician's concurrence on reconsideration)).

Plaintiff's cervical spine (A.R. 1509).[9]  Dr. Davis increased
Plaintiff's Gabapentin dose to three pills twice a day (A.R. 1509).

In August of 2014, Plaintiff presented to a provider complaining
of low back pain and received another course of Prednisone (A.R. 1646-
49).  Later that month, Plaintiff underwent right carpal tunnel
release surgery and, on follow up, reportedly was very happy with her
results (A.R. 1592-95, 1662-75, 1729-30).

In November of 2014, Plaintiff returned to Dr. Davis complaining
of back pain and right anterior thigh pain (A.R. 1719-20).  Dr. Davis
indicated that Plaintiff was "doing fairly well" with her Gabapentin
dose and Percocet as needed (A.R. 1719).  Reportedly, her gait was
antalgic and extension on range of motion markedly increased her back
pain and lumbar muscle spasm (A.R. 1720).  Dr. Davis referred
Plaintiff for acupuncture and an evaluation for an epidural versus
facet injection (A.R. 1720).  Dr. Davis also increased Plaintiff's
Gabapentin dose to four pills twice a day, and encouraged aquatic
therapy and weight loss (A.R. 1720).

In December of 2014, Plaintiff consulted with Dr. Kim for a
lumbar spine injection at L3-L4 (A.R. 1738).  Reportedly, on
examination, Plaintiff's gait was antalgic, her range of motion was
limited, and she had new pain in the area just superior to the
anterior superior iliac spine which sometimes radiates to the anterior

--------

[9]     Nerve conduction studies again were abnormal,
consistent with carpal tunnel syndrome (A.R. 1582-83).  Dr. Davis
referred Plaintiff for carpal tunnel surgery (A.R. 1585).

lateral thigh (A.R. 1740-43).[10]  Dr. Kim referred Plaintiff for

evaluation by another doctor to determine the cause of the pain (A.R.

1743).  Later that month, Dr. Nitin Dhamija evaluated Plaintiff and

diagnosed left meralgia paresthetica and left hip joint pain (A.R.

1755-63).

In January of 2015, Plaintiff consulted with an orthopedist for

her left hip joint pain (A.R. 1802-06).  The orthopedist found no

evidence of hip impingement and found no need for orthopedic treatment

(A.R. 1806).

Meanwhile, Plaintiff messaged Dr. Davis in late December of 2014,

reporting that her pain was getting worse (A.R. 1776).  Dr. Davis

prescribed Morphine (A.R. 1778).  Plaintiff followed up with Dr. Davis

in January of 2015, reporting that she was doing better since she had

been prescribed Morphine (A.R. 1819-20).  She reported that she did

not notice any change in her symptoms from Gabapentin and indicated

that she was still taking Percocet with some relief (A.R. 1820).  On

examination, her gait reportedly was not antalgic but she had some

difficulty transitioning from sitting to standing (A.R. 1820).  Dr.

Davis told Plaintiff to taper off Gabapentin, and referred Plaintiff

---

[10]     A lumbar spine MRI from December of 2014 showed severe
degenerative disk disease at L3-L4, with disk bulge and focal
dorsal epidural fat prominence giving rise to moderate-severe
central stenosis at L3-L4, disk bulge with dorsal epidural fat
prominence giving rise to mild stenosis at L4-L5, moderate-severe
L3-L4 and L4-L5 neural foraminal narrowing, with contact of the
exiting nerve roots at L4-L5 but without impingement, and no
definite contact of the exiting nerve roots at L3-L4 (A.R. 1780-
82).  A whole body bone scan was normal but confirmed Plaintiff's
degenerative disk disease at L3-L4 (A.R. 1788-89, 1798).

for evaluation for left carpal tunnel surgery and a hip injection (A.R. 1821).  Plaintiff messaged Dr. Davis in February of 2015 that she previously had reduced her Gabapentin dosage to one pill a day but she later was having pain so she increased the dosage to two pills a day (A.R. 1831).  Dr. Davis said this was "good news" and showed that Plaintiff was getting some relief from her medication (A.R. 1831).

In March of 2015, Plaintiff presented to a provider complaining of knee and finger pain after a slip and fall approximately a month earlier (A.R. 1859-64).  A knee x-ray was unremarkable (A.R. 1865). She was assessed with left knee pain and right trigger finger, and she received a cortisone injection in her right middle finger for pain (A.R. 1862-63, 1877-82).

In May of 2015, Plaintiff presented to a provider complaining of worsening low back pain for the past three days notwithstanding the fact that she was taking Morphine, Percocet, Neurontin (Gabapentin), and Flexeril for pain (A.R. 1951-54).  She was referred for physical therapy (A.R. 1954).

By June of 2015, when Plaintiff returned to Dr. Davis, she had been given a corticosteroid injection in her left wrist which helped with her carpal tunnel syndrome (A.R. 1937-42, 2019).  She was taking Gabapentin, which reportedly seemed to keep her nerve pain under control (A.R. 2019).  Dr. Davis ordered a nerve conduction study to

///

///

///

check for peripheral neuropathy, continued Plaintiff's Gabapentin, and encouraged her to lose weight (A.R. 2019).[11]

In June of 2015, Plaintiff went back to Dr. Dhamija for another evaluation of her chronic low back and hip pain (A.R. 1998-2001). She was diagnosed with bilateral sacroilitis (A.R. 2001). Dr. Dhamija ordered more hip injections (A.R. 2001). Plaintiff received the first of another series of three bilateral sacroiliac joint injections in July of 2015 (A.R. 2028-29). Plaintiff had a second injection in August of 2015 (A.R. 2102-03). Plaintiff had a third injection in October of 2015 (A.R. 2178-79).

Plaintiff sought to refill her Percocet in November of 2015 and was advised that her prescription had been canceled (A.R. 2199). A new provider allowed one refill but advised Plaintiff there would be no further refills until she presented for an appointment; she was due for an appointment in August of 2015 (A.R. 2204). In December of 2015, Plaintiff presented to Dr. Anh Tuyet Dinh for follow up regarding her pain, reporting that her pain was adequately controlled and there was no mention of side effects or limitations (A.R. 2207). She reportedly was unable to see her primary care physician and wanted refills of her Percocet and Morphine (A.R. 2207, 2225). On examination, Plaintiff's gait reportedly was normal (A.R. 2208). Dr. Dinh assessed congenital kyphosis, chronic back pain, and osteoarthritis, ordered a drug abuse screen and opioid screen, and

---

[11] The nerve conduction study was normal and showed no evidence of peripheral neuropathy (A.R. 2048-49).

refilled Plaintiff's Morphine (A.R. 2209). Plaintiff's primary care physician advised Plaintiff that the physician needed to see Plaintiff personally every six months for further refills of medications (A.R. 2229).

## II. The ALJ Erred in Rejecting Plaintiff's Testimony Regarding the Severity of Her Symptoms.

Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause the symptoms alleged (A.R. 16), the ALJ may not discount the claimant's testimony regarding the severity of the symptoms without making "specific, cogent" findings, supported in the record, to justify discounting such testimony. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must state "specific, clear and convincing" reasons to reject a claimant's testimony where there is no evidence of malingering).[12] Generalized, conclusory findings do not suffice. See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (the ALJ's

---

[12] In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard. See, e.g., Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136-37 (9th Cir. 2014); Treichler v. Commissioner, 775 F.3d 1090, 1102 (9th Cir. 2014); Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014); Garrison v. Colvin, 759 F.3d 995, 1014-15 & n.18 (9th Cir. 2014); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases). In the present case, the ALJ's findings are insufficient under either standard, so the distinction between the two standards (if any) is academic.

credibility findings "must be sufficiently specific to allow a
reviewing court to conclude the ALJ rejected the claimant's testimony
on permissible grounds and did not arbitrarily discredit the
claimant's testimony") (internal citations and quotations omitted);
Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ
must "specifically identify the testimony [the ALJ] finds not to be
credible and must explain what evidence undermines the testimony");
Smolen v. Chater, 80 F.3d at 1284 ("The ALJ must state specifically
which symptom testimony is not credible and what facts in the record
lead to that conclusion."); see also Social Security Ruling 16-3p
(eff. March 28, 2016).[13]

When a claimant testifies to side effects that "are in fact
associated with the claimant's medication(s)," the ALJ may not
disregard such testimony unless the ALJ makes "specific findings
similar to those required for excess pain testimony." Varney v.
Secretary, 846 F.2d 581, 585 (9th Cir. 1988); see also 20 C.F.R. §
404.1529(c)(3)(iv) ("We will consider . . . side effects of any
medication you take or have taken to alleviate your pain or other
symptoms"); SSR 16-3p (mandating consideration of "side effects of any
medications the individual takes or has taken to alleviate pain or
other symptoms"); Cooley v. Astrue, 2011 WL 2554222, at *5 & n.4 (C.D.

_____

[13]    Social Security Rulings ("SSRs") are binding on the
Administration.  See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1
(9th Cir. 1990).  SSR 16-3p superseded SSR 96-7p, but may have
"implemented a change in diction rather than substance." R.P. v.
Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016); see
also Treviso v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017)
(suggesting that SSR 16-3p "makes clear what our precedent
already required").

Cal. June 27, 2011) (ALJ erred in failing to consider side effects of Norco, which claimant alleged caused her to feel drowsy/tired and to lose focus). In the present case, Plaintiff asserted that she could not work while taking her pain medications. The ALJ did not ask Plaintiff to specify what allegedly disabling side effects her medication caused (A.R. 41). In her decision, the ALJ did not mention Plaintiff's statements concerning the allegedly disabling side effects of her medications. The ALJ did, however, discuss and reject Plaintiff's allegations that she could not work because she becomes tired and sleepy, has trouble concentrating, is more forgetful, and has difficulty standing and walking (A.R. 12-13). The ALJ stated that the record did not support these allegations (A.R. 12-13). The ALJ observed that Plaintiff had reported no adverse side effects to Dr. Dinh (A.R. 15).

The record contains several mentions of side effects. Plaintiff testified that she thought she could not work in a "safety position" while on her pain medications (A.R. 28-29). She reported to Dr. Davis that her Gabapentin made her sleepy (A.R. 1509). Dr. Davis opined that a person taking Plaintiff's dosage of Gabapentin could not maintain employment (A.R. 1502). The Court need not decide on this record whether the ALJ stated legally sufficient reasons for implicitly finding not credible Plaintiff's testimony concerning the side effects of her medication. As explained below, the Court finds the ALJ's other reasons for rejecting Plaintiff's subjective complaints legally infirm. These infirmities require remand.

///

///

The ALJ rejected Plaintiff's pain testimony as "less than fully consistent with the evidence" because: (1) Plaintiff supposedly "has not generally received the type of medical treatment one would expect for a totally disabled individual" (i.e., the record purportedly contains significant gaps in treatment, and Plaintiff's use of medication "does not suggest the presence of impairments which is [sic] more limiting than found in [the ALJ's] decision" and the "medical records reveal that the medications have been relatively effective in controlling [Plaintiff's] symptoms"); (2) Plaintiff admitted she received unemployment compensation during the period at issue; and (3) Plaintiff's daily activities were "somewhat normal" in that she could do personal care, pet care, household chores, cleaning, sweeping, mopping, yard work, laundry, meal preparation, cooking, washing dishes, driving, grocery shopping, and going to the store (A.R. 16).

With regard to the first stated reason, a limited course of treatment sometimes can justify the rejection of a claimant's testimony, at least where the testimony concerns physical problems. See, e.g., Burch v. Barnhart, 400 F.3d at 681 (lack of consistent treatment such as where there was a three to four month gap in treatment properly considered in discrediting claimant's back pain testimony); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (in assessing the credibility of a claimant's pain testimony, the Administration properly may consider the claimant's failure to request treatment and failure to follow treatment advice) (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (permissible credibility

factors in assessing pain testimony include limited treatment and minimal use of medications); see also Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (absence of treatment for back pain during half of the alleged disability period, and evidence of only "conservative treatment" when the claimant finally sought treatment, sufficient to discount claimant's testimony). Here, the ALJ's general references to alleged gaps in treatment and to medication use purportedly controlling Plaintiff's symptoms lack the requisite specificity.

As detailed above, the record shows that Plaintiff regularly sought treatment from several providers throughout the alleged disability period, following up as ordered and following all treatment suggestions, including physical therapy, narcotic pain medication, multiple steroid and epidural injections, and surgery. Plaintiff attended all appointments except for the last appointment, an appointment reportedly cancelled by the provider (A.R. 2207). Plaintiff also consistently reported that her medications were not controlling her symptoms despite her compliance, and her medications consequently were increased and changed, as were her treatment modes. The state agency physician purported to find on initial review that Plaintiff's conditions were "satisfactorily controlled with the treatments" (A.R. 46-47). However, this purported finding occurred before Plaintiff received additional prescription pain medication, underwent right carpal tunnel release surgery, and received multiple joint injections for her persistent pain. The only notation in the record the ALJ cited (and the only notation the Court found on review) suggesting that Plaintiff's medications adequately controlled

Plaintiff's pain was authored by Dr. Dinh, the new provider Plaintiff saw last when Plaintiff sought to refill her Percocet and Morphine and reportedly was taking Morphine, Gabapentin, Flexeril, and Percocet for her pain (A.R. 2207-08; compare A.R. 1719 (Dr. Davis reporting Plaintiff was doing "fairly well" on Gabapentin when he referred Plaintiff for an epidural injection evaluation); A.R. 1831 (Dr. Davis noting that it appeared Plaintiff was getting "some relief" from her Gabapentin)).

Assuming, arguendo, the dubious proposition that substantial record evidence supports a finding that Plaintiff's condition has been adequately controlled by medication, the ALJ was not qualified to determine on her own that Plaintiff's use of these strong medications failed to reflect the kind of treatment one would expect for a totally disabled individual. See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ who is not qualified as a medical expert cannot make "his [or her] own exploration and assessment as to [the] claimant's physical condition"); see also Rohan v. Chater, 98 F.3d 966, 970-71 (7th Cir. 1996) (ALJ may not rely on his or her own lay opinion regarding medical matters); Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1995) (same); cf. Rudder v. Colvin, 2014 WL 3773565, at *12 (N.D. Ill. July 30, 2014) ("The ALJ may be correct that disabling limitations from multiple sclerosis would result in more frequent treatment or need for medication. However, the ALJ must include evidence to support such a conclusion in his opinion because he is not qualified, on his own, to make such determinations.") (citations and quotations omitted). Plaintiff's treatment with narcotic pain medication, epidural injections, and surgery may in fact

be entirely consistent with the treatment someone would receive for disabling pain.  See, e.g., Aquilar v. Colvin, 2014 WL 3557308, at *8 (C.D. Cal. July 18, 2014) ("It would be difficult to fault Plaintiff for overly conservative treatment when he has been prescribed strong narcotic pain medications"); Christie v. Astrue, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to categorize as "conservative" treatment including use of narcotic pain medication and epidural injections).  Both the Court and the ALJ lack the requisite medical expertise to determine whether Plaintiff's medical treatment is the type of medical treatment one would expect for a disabled person with her condition.

With regard to the second stated reason, the fact that Plaintiff received unemployment benefits does not properly undermine Plaintiff's credibility under the circumstances presented.  The ALJ reasoned that Plaintiff's receipt of unemployment compensation required her to certify that she was willing and able to engage in work activity, which assertedly was inconsistent with a claim of disability (A.R. 16).  Plaintiff reportedly stopped working when she was laid off in January of 2012, and she alleged disability as of January of 2013 due to her worsening physical condition (A.R. 28-29, 120, 135).  Plaintiff admitted that she received unemployment for six to 12 months as she looked for jobs (A.R. 29-30; see also A.R. 122 (report suggesting that unemployment benefits may have been paid in the third quarter of 2013)).

The receipt of unemployment benefits sometimes can undermine a claimant's alleged inability to work full time.  See Copeland v.

Bowen, 861 F.2d 536, 542 (9th Cir. 1988) (upholding ALJ's rejection of claimant's credibility where claimant had accepted unemployment insurance benefits "apparently considering himself capable of work and holding himself out as available for work"); see also Fennell v. Berryhill, 2018 WL 328141, at *2 (9th Cir. Jan. 9, 2018) (ALJ properly discredited claimant's testimony where she held herself out as available for full-time work when receiving unemployment benefits during the adjudicatory period; citing Carmickle); Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (fact that a claimant has sought out employment weighs against a finding of disability); see also Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014) ("continued receipt" of unemployment benefits can cast doubt on a claim of disability); but see Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005) ("That Webb sought employment suggests no more than that he was doing his utmost, in spite of his health, to support himself").  In California, however, an individual available for only part-time work is not disqualified from unemployment compensation eligibility.  See Cal. Unemp. Ins. Code § 1253.8; compare 20 C.F.R. § 404.1545(b) (claimant under the Social Security Act is assessed for capacity to work "on a regular and continuing basis"); Social Security Ruling 96-8p, 1996 WL 374184, at *2 (defining "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule").  The record does not establish whether Plaintiff held herself out as available for full-time or part-time work.  Plaintiff simply testified that she was looking for work that did not require lifting and that would permit her to get up and walk around (A.R. 28-29).  The record does not contain Plaintiff's application for unemployment compensation.  Accordingly, the Court

finds that the evidence in the record that Plaintiff received
unemployment compensation did not give rise to a legally sufficient
reason to reject Plaintiff's allegations.  See Carmickle v.
Commissioner, 533 F.3d at 1161-62 (finding ALJ's adverse credibility
finding not supported by substantial evidence where record failed to
establish whether the claimant held himself out as available for full-
time or part-time work; observing that only the former is inconsistent
with disability allegations); Mulanax v. Commissioner of Social Sec.,
293 Fed. App'x 522, 523 (9th Cir. 2008) (receipt of unemployment
benefits by itself did not support a conclusion that a claimant was
less than credible; Oregon law provided that a person available for
some work including part-time work is eligible for unemployment
benefits, thus a claim of unemployment was not necessarily
inconsistent with claim of disability benefits under the Social
Security Act); Lind v. Colvin, 2015 WL 1863313, at *3-4 (C.D. Cal.
Apr. 23, 2015) (record evidence of unemployment compensation
inadequate to support ALJ's adverse credibility determination where
record did not contain the claimant's unemployment benefits
application, and did not specify whether the claimant had certified he
was available for full- or part-time work).

    With regard to the third stated reason, inconsistencies between
admitted activities and claimed incapacity properly may impugn the
accuracy of a claimant's testimony and statements under certain
circumstances.  See, e.g., Thune v. Astrue, 499 Fed. App'x 701, 703
(9th Cir. 2012) (ALJ properly discredited pain allegations as
contradicting claimant's testimony that she gardened, cleaned, cooked,
and ran errands); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th

Cir. 2008) (claimant's "normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances" was sufficient explanation for discounting claimant's testimony).  However, it is difficult to reconcile certain Ninth Circuit opinions discussing when a claimant's daily activities properly may justify a discounting of the claimant's testimony and statements.  Compare Stubbs-Danielson v. Astrue with Vertigan v. Halter, 260 F.3d 1044, 1049-50 (9th Cir. 2001) ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability"); see also Diedrich v. Berryhill, 874 F.3d 634, 642-43 (9th Cir. 2017) (daily activities of cooking, household chores, shopping and caring for a cat insufficient to discount the claimant's subjective complaints).

Here, the Court finds that Plaintiff's daily activities of cooking, doing some household chores, shopping, and picking up after her dogs, which she said she did at her own pace and on "good days,"[14]

---

[14]    Plaintiff testified that she spent her days picking up after her dogs in her yard, cooking dinner and doing laundry with her husband's help, and going to the store if she has to go (A.R. 32-34).  Plaintiff said that her daughter does the household chores like mopping, sweeping, and the "really intense things" (A.R. 32).  Plaintiff did the rest of the chores (i.e., laundry, cooking, dishes, sweeping, vacuuming, mopping) at her own pace, interrupted by sitting (A.R. 32).  Plaintiff drove once or twice a week for groceries (A.R. 27).

    In a "Fatigue Questionnaire" dated January 18, 2014, Plaintiff reported that she spends her days making breakfast for herself and her disabled husband, and that she sweeps, mops,
                                                          (continued...)

are not so extensive as properly to undermine Plaintiff's credibility. See Revels v. Berryhill, 874 F.3d 648, 667-68 (9th Cir. 2017) (ALJ erred in finding disparity between claimant's reported daily activities and symptom testimony where the claimant indicated she could use the bathroom, brush her teeth, wash her face, take her children to school, wash dishes, do laundry, sweep, mop, vacuum, go to doctor's appointments, visit her mother and father, cook, shop, get gas, and feed her dogs, where the ALJ failed to acknowledge the claimant's explanation consistent with her symptom testimony that she could complete only some tasks in a single day and regularly needed to take breaks).

## III. **Substantial Evidence Does Not Support the ALJ's Residual Functional Capacity Determination.**

The ALJ's residual functional capacity assessment lacks sufficient evidentiary support in the present record. There are no consultative examiner opinions in the present record. The only treating source to offer any opinion concerning Plaintiff's ability to work was Dr. Davis, who stated that Plaintiff was "disabled" due to her medications. See A.R. 515-22, 1502-06. The ALJ relied on the non-examining state agency physician's opinions to determine Plaintiff's physical residual functional capacity. See A.R. 16

---

[14](...continued)
"scoop[s] the back yard," does laundry, makes dinner and does dishes (A.R. 150-51). Plaintiff reportedly napped daily and noted that on bad days she could sleep all day and still sleep at bedtime (A.R. 150-51). She reported that she does not drive when she is tired because she nods off (A.R. 150).

(describing opinions as "substantiated by objective medical evidence
and consistent with the record as a whole"); see also A.R. 47-48, 57-
58 (state agency physician residual physical functional capacity
determinations made without the benefit of any treating source
opinions for review).  The opinions of the non-examining state agency
physicians, which contradict Dr. Davis' opinion that Plaintiff is
disabled, do not constitute substantial evidence to support the ALJ's
decision.  See Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) ("When
[a nontreating] physician relies on the same clinical findings as a
treating physician, but differs only in his or her conclusions, the
conclusions of the [nontreating] physician are not 'substantial
evidence.'"); Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir.
1990) ("The nonexamining physicians' conclusion, with nothing more,
does not constitute substantial evidence, particularly in view of the
conflicting observations, opinions, and conclusions of an examining
physician"); compare Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th
Cir. 2001) (opinion of non-examining medical source "may constitute
substantial evidence when it is consistent with other independent
evidence in the record").

**IV.  RemState for Further Administrative Proceedings is Appropriate.**

Because the circumstances of this case suggest that further
administrative review could remedy the ALJ's errors, remand is
appropriate.  See McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011);
see also Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003)
("Connett") (remand is an option where the ALJ fails to state
sufficient reasons for rejecting a claimant's excess symptom

testimony); but see Orn v. Astrue, 495 F.3d 625, 640 (9th Cir. 2007)

(citing Connett for the proposition that "[w]hen an ALJ's reasons for

rejecting the claimant's testimony are legally insufficient and it is

clear from the record that the ALJ would be required to determine the

claimant disabled if he had credited the claimant's testimony, we

remand for a calculation of benefits") (quotations omitted); see also

Vasquez v. Astrue, 572 F.3d 586, 600-01 (9th Cir. 2009) (a court need

not "credit as true" improperly rejected claimant testimony where

there are outstanding issues that must be resolved before a proper

disability determination can be made); see generally INS v. Ventura,

537 U.S. 12, 16 (2002) (upon reversal of an administrative

determination, the proper course is remand for additional agency

investigation or explanation, except in rare circumstances).[15]

///

///

///

///

///

///

///

///

///

///

---

[15]     There are outstanding issues that must be resolved
before a proper disability determination can be made in the
present case.  For example, it is not clear whether the ALJ would
be required to find Plaintiff disabled for the entire claimed
period of disability even if Plaintiff's testimony were fully
credited.  See Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir.
2010).

**CONCLUSION**

For all of the foregoing reasons,[16] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: May 1, 2018

_____/s/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[16]    The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.